## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

PARKWAY ASSOCIATES, INC.,            )
                                     )
    Plaintiff,                        )
                                     )
v.                                   )      NO. 3:99-0161
                                     )      JUDGE HAYNES
HARLEYSVILLE MUTUAL                  )
INSURANCE COMPANY,                   )
                                     )
    Defendant.                        )

## M E M O R A N D U M

This action is before the Court on remand from the Sixth Circuit Court (Docket Entry No. 142) that affirmed in part, and reversed in part, the Court's prior Memoranda and Orders (Docket Entry Nos. 93, 94, 133 and 134). On remand, this Court is to address: (1) Parkway's claim of equitable estoppel; (2) whether Parkway is entitled to a contractor's overhead and profit; and (3) whether prejudgment interest should be awarded. After remand, the parties engaged in additional discovery. (See Docket Entry Nos. 153, 159 and 161).

Before the Court is Defendant Harleysville Mutual Insurance Company ("Harleysville") motion for partial summary judgment (Docket Entry No. 149), contending, in essence that Plaintiff's estoppel claim is based upon the same facts as Plaintiff's bad faith, Tennessee Consumer Protection Act ("TCPA"), and misrepresentation claims. The Sixth Circuit affirmed the dismissal of those claims. Harleysville also contends that under the applicable law, equitable principles govern an award of prejudgment interest and the facts do not demonstrate any inequity. Finally, Harleysville contends that its insurance policy's provision that replacement costs cannot be paid until repairs were made, bars Parkway's breach of contract claim. The issue of the contractor license is not presented

in this motion.

In its response, Parkway first characterizes the time lapse as between the date of its loss and the date of the appraisers' award (i.e., 52 months). Plaintiff then argues the Defendant's "delay, inaction, and misleading conduct," arises from the Defendant's failure to investigate, evaluate and pay Plaintiff's claims promptly as well as the Defendant's initiation of settlement talks. Plaintiff argues that the Defendant has waived the actual repair before pay clause in the parties contract.

## B. FINDINGS OF FACT[1]

Harleysville issued a commercial insurance package policy to Parkway to insure an older eight-story structure that was designed and was utilized as a hotel. (Docket Entry No. 29, Plaintiff's Responses to Defendant's Statement of Undisputed Material Facts at ¶ 1). On April 7, 1998, Gregg Parker, an adjuster for Harleysville, received a telephone call from Joanne Duke, a claim manager for Harleysville, advising Parker of the loss sustained at Parkway's property due to a tornado in the area on April 6, 1998. Id. at ¶ 2.

Soon thereafter, Parker contacted Tommy Throneberry of Parkway to inform Throneberry of an April 18, 1998 visit to inspect Parkway's loss. Id. at ¶ 3. Parker inspected Parkway's property

---

[1]     Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1886) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 276 (1986). The Court adopts its earlier findings of fact (Docket Entry Nos. 93 and 133) in this section. Under those facts, the subsequent factual submissions and the applicable law, the Court concludes that there are not any material factual disputes. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

2

on the morning of April 18th. Id. at ¶ 4. At that time, Parker advanced Parkway $50,000.00 to handle the immediate cleanup and to prevent further damage or injury. Id. at ¶ 5. In the initial phases of the claim process, Harleysville advanced Parkway a total of $348,995.00 in installments as follows:

| DATE | PAYEE DESCRIPTION | AMOUNT OF PAYMENT |
|------|-------------------|-------------------|
| 4-20-98 | Insured and mortgagee | $50,000.00 |
| 5-14-98 | Insured and mortgagee | $50,000.00 |
| 6-15-98 | Insured and mortgagee | $50,000.00 |
| 7-30-98 | Insured, mortgagee and roofer | $33,995.00 |
| 7-30-98 | Insured and mortgagee | $65,000.00 |
| 9-11-98 | Insured and mortgagee | $100,000.00 |

Id. at ¶ 9.

Parker also contacted Chip Sharp of Jay Construction Company to repair Parkway's roof as soon as possible. Id. at ¶ 6. Parker represented that a meeting with Parkway would occur after Harleysville received an estimate of repair costs from Jay Construction. (Docket Entry No. 43, Plaintiff's Response to Defendant's Supplemental Reply to Response of the Plaintiff to Defendant's Motion for Summary Judgment at ¶ 1). Jay Construction began to prepare estimates, obtained subcontract quotations and performed emergency work. Id. at ¶ 4.

James Fisher, who is not a licensed contractor, was Parkway's agent to stabilize and secure the property. Id. at ¶¶ 3 and 6. While Jay Construction expected to perform all of the repair work to the property, Fisher who supervised the construction work for Parkway, questioned Sharp about his paperwork for these repairs. (Docket Entry No. 47, Fisher deposition at pp. 88-91). Fisher told Jay Construction that Parkway would not sign a contract for Jay Construction to do further work without estimates or plans as to what repairs Jay intended to perform. (Docket Entry No. 44, Fisher

3

Affidavit at ¶¶ 1-9). Fisher asserts that he was told Parkway would be liable for these repair costs. Id. Throneberry instructed Fisher to tell Jay Construction not to perform any work without estimates and plans. Id. at ¶¶ 6 and 7). Parker was informed of Fisher's statement and told Jay Construction on May 15, 1998 not to proceed without a building estimate. Id.

Harleysville retained Alan T. Moore, a certified public accountant, on April 24, 1998 to analyze the books and records of Parkway to evaluate Parkway's claim for business income loss. (Docket Entry No. 16, Moore Affidavit at ¶ 3). On April 30, 1998, Moore conducted a preliminary review of Parkway's property with Tommy Throneberry, its designated representative. Id. at ¶ 5. At that meeting, Throneberry advised that he had retained Alex N. Sill Company ("Sill Company") to represent his interest regarding the business interruption claim. Id. Throneberry advised Moore to communicate directly with Joe Migliore, a certified public accountant with the Sill Company. As a result of Throneberry's direction, on May 1, 1998, Moore wrote Migliore to request certain records to assist in Harleysville's evaluation of Parkway's claim. Id. Parkway also retained a public adjuster, George Hoffman with Sill Company, to assist with its claim and damage analysis. (Docket Entry No. 29, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 8).

On May 1, 1998, Moore sent correspondence to Migliore requesting 14 separate items. (Docket Entry No. 53, Migliore Deposition at p. 51). According to Migliore, some of the items on Moore's list may not have existed or may have been too voluminous to copy, but Migliore later agreed that Moore's requests were neither. Id. at pp. 51-52. Accountants for the insured and the insurance company usually exchange documents for the evaluation of the business interruption claim. Id. at p. 53. On May 4, 1998, Migliore informed Throneberry of Moore's request. Id. at p. 54. Throneberry never told Migliore that the documents requested by Moore did not exist. Id. On

4

August 18, 1998, Migliore requested additional information of Throneberry for Migliore's preparation of his work on Parkway's claim. Id. at p. 55. Migliore can not recall when Throneberry actually provided the documents needed for Migliore's report. Id. Migliore cites a fax on continuing expenses from Throneberry dated August 28, 1998. Id. at p.60.

On May 29, 1998, Moore received certain records sent pursuant to his request. Migliore advised that certain information still needed to be provided. That information is a follows:

1. 1997 tax return;

2. Operating statements for January 1998 through present;

3. Number of rooms sold, by month, for January through July 1997;

4. Number of rooms sold, by month, for January, march, and May through December 1996.

Id. at ¶ 27.

On June 29, 1998, Moore advised Migliore that certain information was needed and remained outstanding. Id. at ¶ 25. Again, on July 21, 1998, Moore requested that certain information be provided in order to evaluate the business interruption claim. Id. at 26. Some time after directing the July 21, 1998 correspondence to Migliore with copies to the insured, Moore was instructed to address his correspondence to Throneberry with a copy to Migliore. Id.

On October 22, 1998, Parker met with Parkway's adjuster at the hotel property to try and settle the claim. Id. at ¶ 10. Parkway, however, challenges Parker's preparation for the meeting. (Docket Entry No. 25, Throneberry Affidavit at ¶ 27 and Docket Entry No.24, Hoffman Affidavit at ¶¶ 23 and 24).

On September 10, 1998, Moore requested that Throneberry provide certain documentation

and records which would assist in his evaluation of the business interruption claim. (Docket Entry No. 16, Moore Affidavit at ¶ 7). According to Migliore, these requests were not "terribly out of the ordinary"and "nothing unreasonable" or "unduly burdensome." (Docket Entry No. 53, Migliore Deposition at p. 63). Migliore did refer to Moore's request for invoices to be "highly unusual", but agreed that the request was the only way to verify income if the insurance company did not believe the insured's income statement. Id at pp. 70-71.

On September 21, 1998, Parkway readjusted its business interruption claim from $350,000 to $229,886. Id. at p. 89. As of December 14, 1998, Joseph Migliore did not have an opinion on whether Parkway's business interruption claim was based upon updated actual dated September 21, 1998 for $197,191 or Parkway's alternative claim of $800,000 based upon "alternative assumptions" of higher room rates and occupancy rates that Parkway's attorney requested him to prepare. Id. Migliore testified that different assumptions could produce different financial results on Parkway's loss claim. Id. at pp. 98-99.

On September 21, 1998, Moore received a copy of Parkway's interruption claim proposed by the Sill Company .

> Enclosed is a copy of our claim presentation that has been reviewed by the client. He granted permission to Joe Migliore, CPA of this firm, to submit to you. I am sending you a copy via overnight delivery, with copies to the client for his file and to Gregg Parker at his Charlotte office.

Id. at ¶ 10.

The Sill Company analysis of Parkway's business interruption and extra expense claim totaled $325,905, for the loss period of April 16, 1998 through April 15, 1999. Id. at ¶ 11. Harleysville informed Moore that the "period of restoration" was four and one-half months. (Docket

6

Entry No. 27, Moore Deposition at p. 80). Moore considered Parkway's loss claim for a period of one year to be a projected loss claim. (Docket Entry No. 27, Moore Deposition at p. 128). In Parker's view, Parkway's business should have reopened within twelve (12) weeks of the tornado, Docket Entry No. 26, Parker Deposition at pp. 74-77, with a partial reopening in 30 days. Id. at p. 75. Parkway asserts that Harleysville never informed them of the "loss period." (Docket Entry No. 25, Migliore Affidavit at ¶ 9).

By October 20, 1998, Moore had still not received certain records and documentation that he had previously requested and again requested Throneberry to provide the outstanding documents, specifically:

     I.    Based on our analysis of your claim received on September 22, 1998

          A.    Invoices for expenses incurred during the loss period.

          B.    For any loans, amortization schedules and payments histories through the loss period.

(Docket Entry No. 29, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 30).

On November 13, 1998, Moore received correspondence dated November 10, 1998 that specifically provided additional information pursuant to his October 20th request. More importantly, the correspondence from Migliore specifically requested that Throneberry provide additional information as follows:

     1.    Schedule showing Miscellaneous Expense on 1995, 1996 and 1997 tax returns

     2.    Copies of the daily report for the last day of the month for May and June 1997.

Id. at ¶ 31.

On December 21, 1998, Moore received additional information from Migliore regarding

documentation that had not yet been presented. Id. at ¶ 32. Moore was advised that Parkway and

Harleysville had retained counsel and as of January 13, 1999, Moore ceased his communication with

Parkway directly. ( Docket Entry No. 16, Moore Affidavit at ¶ 15 and Docket Entry No. 27, Moore

Deposition at pp. 75-76). Moore's review of the documentation provided by Parkway's counsel

revealed that some of the documentation requested by Harleysville had not been produced, and some

of the documentation involved a separate hotel. (Docket Entry No. 16, Moore Affidavit at ¶ 18).

Subsequent events reflect that Moore received documents from four different sources without date

stamps as to when the documents were received. (Docket Entry No. 27, Moore Deposition at pp. 34-

35). The cover letters in his file, however, serve to verify when the documents were received and

from whom. Id. at p. 43.

On December 16, 1998, Migliore sent a letter to Moore stating his understanding that

Harleysville had all of the information that had been requested.(Docket Entry No. 25, Migliore

Affidavit at ¶ 13. Harleysville never responded to his December 16th letter and did not request any

additional documentation until this action was filed on March 1, 1999.

Harleysville had requested in writing on numerous occasions that Parkway present certain

documents to facilitate the settlement of Parkway's business interruption claim. (Docket Entry No.

29, Plaintiff's Response to the Defendant's Statement of Undisputed Facts at ¶ 4). With respect to

the business interruption claim, Parkway's business sustained net operating losses for the years

preceding the date of the claim arose and had sustaining net operating losses when the claim arose.)

Id. at ¶ 17. Based on these facts, it was necessary for Harleysville to review the plaintiff's records

to document the continuing expenses of the plaintiff. Id. at¶ 18. The evaluation involved an analysis

of non-continuing expense. (Docket Entry No. 27, Moore Deposition at p. 25). Doris Waldron who

8

had the responsibility to monitor the documentation that had been sent to Harleysville regarding the business interruption claim, was unsure or did not know Harleysville's requirements regarding invoices and receipts in loss determinations. (Docket Entry No. 27, Waldron Deposition at p. 8).

In mid-January of 1999, an examination under oath was taken of Mr. Throneberry. (Docket Entry No. 29, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 34).

In correspondence dated June 30, 1999, Moore requested that Harleysville's attorney secure the documentation that had not been provided. (Docket Entry No. 29, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 36). Prior to the deposition of Doris Waldron, Harleysville's counsel received certain documentation. Id. at ¶ 37.[2] On July, 15, 1999, counsel for Harleysville provided Moore with certain documentation. Id. at ¶ 38. After review of the documentation provided July 15, 1999, by letter dated August 16, 1999, Moore requested an update on information that had not been provided, and explained why the outstanding information was necessary. Id. at ¶ 39.

On August 20, 1999, Parkway's counsel was made aware of Moore's request and reasons for the request. Id. at ¶ 40. As of this date, the information requested in Moore's correspondence of August 16, 1999 and August 20, 1999 has not yet been provided. (Docket Entry No. 16, Moore Affidavit at ¶ 24). In Moore's view, he could not render an opinion and/or calculate the business interruption claim without the information requested. Id. at ¶ 25.

The parties agree that business interruption claims are basically estimates. (Docket Entry No.

---

[2]     Plaintiff's response to the Statement of Undisputed Facts is that this fact is immaterial, but this response does not comply with Local Rule 8(b)(7) requiring a documented reference to evidentiary materials establishing a factual dispute. This Court deems this fact and facts with similar responses to be admitted.

9

43, Plaintiff's Response to Defendant's Supplemental Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment at ¶ 10). With renovations ongoing, the business interruption claim may be subject to different interruptions. Id. at ¶ 12. The parties agree that reasonable differences of opinion can arise between an insurance company and an insured upon the effect or impact of the ongoing renovations at the time of the loss. Id. at ¶¶ 13 and 14. Likewise the insured and the insurance company can have different interpretations on continuing expenses, the time for restoration, revenue and expenses. Id. at ¶¶ 15 and 16.

The insurance contract policy language required Parkway to cooperate fully with Harleysville in the investigation and processing of Parkway's claim: "You must see that the following are done in the event of loss . . . (7) Cooperate with us in the investigation or settlement of the claim."(Docket Entry No. 23, Throneberry Affidavit, Attachment thereto at BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM CP OO 30 06 95 at p.4 ). The policy also required Parkway to produce any pertinent business records for inspection by Harleysville:

> (5) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.
>
> Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

Id. at p. 4. There was also express provisions for co-insurance. Id. at p. 5.

Other significant terms of the policy is that under the "Building and Personal Property Coverage" the policy, "[Harleysville] will determine the value of Coverage Property in the event of loss of damage . . ." Id. at CP 00 10 06 95 at p. 7. Further, the insurance contract expressly provides that the "mortgage holder has the right to receive loss payment." Id. at p. 9. Moreover, under BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM CP 00 30 06 95, the

10

parties agreed as follows:

> If we and you disagree on the amount of the Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser.
>
> <u>The two appraisers will select an umpire. If they can not agree, either may request that selection be made by a judge of a court having jurisdiction</u>. The appraisers will state separately the amount of Net Income and the operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding . Each party will:
>
> > a.    Pay its chosen appraiser; and
> >
> > b.    Bear the other expenses of the appraisal and the umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.

<u>Id</u> at CP 00 30 60 95 at p. 3 (emphasis added). The Court notes that under the general provisions

of the policy: "No person . . . has a right under this Coverage Part . . . **b.** To sue us on this Coverage

Part unless all of its terms have been fully complied with." <u>Id</u>. at CG 00 01 01 96 at p. 9, ¶ 3B.

As to Harleysville's alleged misrepresentations, Parkway cites the following evidence of such

statements and omissions by Harleysville:

> a)    that Floors 2, 3 and 4 were not covered under the policy because they were under construction. (Throneberry Deposition, Page 12 1, Lines 8-14; Page 13 1, Lines 1-8);
>
> b)    that the tower roof would be fully replaced but then refused to pay for it without explanation. (Throneberry Deposition, Page 134, Lines 20-25; Page 135, Lines 1-9);
>
> c)    that the policy did not cover pre-existing damage when the policy so provided. (Throneberry Deposition, Page 195, Lines 4-6);
>
> d)    that it was Parkway's responsibility to provide documentation when the policy assigns Harleysville the  responsibility to examine the books and records of Plaintiff. (Throneberry Deposition, Page 190,lines 20-25;
>
> e)    that Harleysville delayed resolution by leading Parkway to believe that it was

11

awaiting a Jay Construction estimate when Harleysville knew that there would be no estimate and then insisted upon hiring an engineer three and one-half (3 ½) months after the claim was filed . (Hoffman Deposition, Page 49, Lines 18-23; Throneberry Deposition, Page 125, Lines 16-25, Page 126, Lines 1-3 Parker Deposition, Page 90, Lines 19-25, Page 91-95 and Page 96, Lines 1-24);

f)     that Harleysville had failed to investigate in excess of six (6) months after the inception of the claim, completed its own estimates and proceeded to meet with the plaintiff with little or no preparation and offered substantially less than half of the claimed value without adequate explanation beyond a two page handwritten notation that Harleysville represented as its contents evaluation. (Hoffman Deposition, Page 49, Lines 18-23);

g)     that Harleysville failed to return telephone calls or communicate with Parkway in a prompt fashion. (Throneberry Deposition, Page 147, Lines 9-19- Hoffman Deposition, Page 64, Lines 11 - !8 and Page 74, Lines 7-24);

h)     that Harleysville forced the Plaintiff into litigation by sending the file to its Nashville office and assigning same "negotiator" primarily responsible for legal files who allegedly manifested a desire to resolve Parkway's claim but Harleysville had no intent to do so. (Throneberry Affidavit, Page 7, Paragraph 29; Waldron Deposition, Page 25, Lines 18-25, Page 26, Line 1);

I)     that Harleysville hired a lawyer to take the plaintiff's examination under oath but did not ask for one single document it did not already have but now professes that it could not evaluate the business interruption claim (which to this date it has failed to do) because of a lack of documentation. (Throneberry Affidavit, Page 8, Paragraph 32);

j)     that Harleysville placed the mortgage holder's name on each draft, knowing full well that the mortgage holder would get the vast portion of the draw, while insisting that plaintiff should have spent that same draw money on repairs rather than mortgage payments. (Throneberry Deposition, Page 175, Lines 22-25, Page 176 and Page 177, Line 1; Parker Deposition, Page 140, Lines 4-25).

(Docket Entry No. 43, Plaintiff's Response to Defendant's Supplemental Reply to Plaintiff's

Response to Defendant's Motion for Summary Judgement at pp. 9-11).

As to paragraph (a), the cited portions of Throneberry's deposition do not establish the

statement to be false or at variance with the policy's terms. As to paragraph (b), Fisher's testimony is that Jay Construction intended to repair the roof until Throneberry refused to allow the work without further documentation. (Docket Entry No. 47, Fisher Deposition at pp. 87-88). For Paragraph (c), Throneberry's testimony does not provide a basis in the contract for coverage of preexisting damage. The policy excluded coverage of "Impaired Property". (Docket Entry No. 23, Attachment thereto Policy at CG 00 01 01 96 at p. 4, ¶¶ m and n).

As to paragraph (d) that Harleysville required Parkway "to provide documentation" as opposed to the policy's requirement only of cooperation, the policy expressly provided for Harleysville to examine Parkway's books and records of its expenses. Id. at CP 00 30 06 95 at pp. 3-4. The loss determination "that would be made [is to be based] upon Parkway's financial records, bills, invoices and other vouchers." Id. at pp.4-5

For the delay in securing a bid for Jay Construction and failure to investigate in paragraphs (e) and (f), as noted earlier, Jay Construction was at the property shortly after the tornado, but was told by Throneberry not to proceed without paperwork. According to Parker, it was Parkway's denial of access to the property that precluded Jay Construction from completing its bid estimate. (Docket Entry No. 26, Parker's Deposition at pp. 90-95). In any event, in October 1998, Parker gave Hoffman a partial estimate. (Docket Entry No. 51, Hoffman Deposition at p. 49). Concerning the failure to return telephone calls promptly, the cited proof concerns an August 28th letter from Throneberry to Parker. Yet, on earlier occasions, Parker did return Throneberry's telephone calls. (Docket Entry No. 39, Throneberry Deposition at p. 147). In any event, Throneberry got a response to his August 28th letter on October 22nd . Id. at p. 148.

For his contention that Throneberry was coerced into litigation in paragraph (h), according

13

to the citation to the evidentiary record, the specifics of this charge is that Harleysville hired a lawyer. (Docket Entry No. 23, Throneberry Affidavit at ¶ 29). Yet, in response to an earlier settlement offer, it was Throneberry who first hired counsel. Id. at ¶ 29. A related contention is that Harleysville hired a lawyer to take his examination on his loss claim under oath, id. at ¶ 32, but the parties' insurance contract provided for such an examination. Id. at Attachment, CP 00 30 06 96 at p. 4, ¶ 2, b.

Finally in paragraph (j) with Harleysville's placement of the mortgage holder on the draft checks to Throneberry, again the policy provided for this method of payment. Id. at Attachment "Building and Personal Property Coverage Form" CP 00 10 06 95 at p. 9, ¶ F, 2 a through e.

After the Court referred the parties to the appraisal process, on September 18, 2003, the appraisers' issued an award reflecting the agreed upon value of the loss with two different valuations: "replacement cost value" and "actual cash value," depending on the terms of the policy. The actual cash value established by the appraisers was $607,727.99, while the replacement cost value was $694,549. The appraisers' award allocated for "General Contractor's Overhead and Profit" of $61,519.76 for the replacement cost and $57,282.63 for the actual cash value. Additionally, the award includes coverage of a sign that exceeds the Policy's coverage.

The Court ruled on Harleysville's motion to confirm the Appraiser's Award and specifically found that the making of repairs was precondition to receiving repair costs and the undisputed fact was that the repairs had not been made. (Docket Entry No. 135, Memorandum at 4-5).

As to other issues before the Court on remand, this Court notes that the policy on the appraisal process provides as follows:

Appraisal

14

> If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their difference to the umpire. A decision agreed to by any two will be binding.

See (Docket Entry No. 119, Exhibit B, Policy, Building and Personal Property Coverage Form, ¶E.2.

As to the appropriate valuation method, the policy contains express provision as to replacement value and payment of replacement costs:

> Replacement cost
>
> **d.      We will not pay on a replacement cost basis for any loss or damage:**
>             **(1) Until the lost or damaged property is actually repaired or replaced**; and
>             (2) Unless the repairs or replacement are made as soon as reasonably possible after the loess or damage.
>
> e.       We will not pay more for loss or damage on a replacement cost basis than the least of...
>
>       (1) the Limit of insurance applicable to the lost or damaged property;
>
>       (2) The cost to replace, on the same premises, the lost or damaged property with other property:
>                   (a) Of comparable material and quality; and
>
>                   (b) Used for the same purpose; or
>
>       (3) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

Id. at, ¶G.3 (emphasis added). Here, it is undisputed that Plaintiff's property at issue has not yet been completely repaired.

In addition to its citation of proof submitted in earlier proceedings, Parkway cites as post remand evidence the deposition of Doris Waldron, a former adjuster for Harlesyville, who was one

15

of the adjusters on Plaintiff's claim. The disputes exist on Plaintiff's characterization of Waldron's deposition testimony. (See Docket Entry No. 188 at ¶¶ 1, 6 and 7). From the Court's review, Waldron responded to a series of questions about the contract and the evaluation process, and Plaintiff solicited her opinions. Yet, Waldron's response reflect that the processing and evaluation of a claim depended upon the information available to the company and the circumstance of each claim. Parkway also cites Harleysville's settlement offer and related estimate, but under Fed. R. Evid. 408, the Court cannot consider that proof.

## B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment <u>sua</u> <u>sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp.</u> <u>v. Catrett</u>, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). <u>Accord</u>, <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

16

> As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing law
> will properly preclude the entry of summary judgment. Factual disputes that are
> irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined

a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita

Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89

L.Ed.2d 538 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where there

has been a reasonable opportunity for discovery, the party opposing the motion must make an

affirmative showing of the need for additional discovery after the filing of a motion for summary

judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v.

Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required

showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility
> of informing the district court of the basis for its motion, and identifying those
> portions of "the pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes demonstrate the
> absence of a genuine issue of material fact. . . . [W]e find no express or implied
> requirement in Rule 56 that the moving party support its motion with affidavits or
> other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule

17

56(c) standards." <u>Martin v. Kelley</u>, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. <u>Sims v. Memphis Processors, Inc.</u>, 926 F.2d 524, 526 (6th Cir. 1991)(quoting <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 353 (6th Cir. 1989) (quoting <u>Celotex</u> and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting <u>Liberty Lobby</u>). Moreover, the Court of Appeals explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

<u>Street</u>, 886 F.2d at 1480 (cites omitted). See also <u>Hutt v. Gibson Fiber Glass Products</u>, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting <u>Liberty Lobby</u>)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

18

More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.

* * *

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed</u>.'

<u>Liberty Lobby</u>, 477 U.S. at 248, 252, 106 S. Ct. 2505, 91 L.Ed.2d at 211-212, 214 (citation omitted and emphasis added). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d 43, 46 (6th Cir. 1986) <u>app.</u> 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of."

19

Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) cert. denied 110 S.Ct. 1839, 108

L.Ed.2d 967 (1990). Here, the parties have given some references to the proof upon which they rely.

Local Rule 8(b)(7)(A) and (C) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and

other authorities on summary judgment and synthesized ten rules in the "new era" on summary

judgment motions

1.  Complex cases are not necessarily inappropriate for summary judgment.

2.  Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.  The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.  A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.  As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

20

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.     The trial court has more discretion than in the `old era' in evaluating the respondent's evidence.  The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment:  (1) has the moving party "clearly and convincingly" established the absence of material facts?;  (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?;  (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

For its equitable estoppel claim, Parkway contends that Harlyesville prevented from any repairs to the property due its "delay, inaction and misleading conduct," citing delays the Defendant's evaluation and payment of Plaintiff's claim.  Estoppel "requires as a minimum: (1) reliance upon the statement or actions of another without opportunity to know the truth;

21

and (2) action based on that reliance which results in detriment to the one acting." <u>Campbell v. Precision Rubber Products Corp.</u>, 737 S.W.2d 283, 286 (Tenn. Ct. App. 1987). Estoppel is not favored and the party invoking estoppel must prove each and every element. <u>Bokor v. Holder</u>, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986). The doctrine of equitable estoppel "rests upon the necessity of requiring men to deal honestly and fairly with their fellow men." <u>Ryan v. Lumberman's Mut Cas Co.</u>, 485 S.W2d 548, 550 (Tenn. 1972).

Although the parties exchanged some information and made some estimates of replacement costs, the Court again finds that Parkway had knowledge of the terms of the policy and of Harleysville's requests and needs for additional information. The proof establishes that Parkway interfered with Harleysville's efforts to repair its property. Parkway also failed to furnish timely the information requested by Harleysville. By September 11, 1998, Harleysville had advanced Plaintiff $148,995.00. On October 22, 1998, Harleysville had paid Plaintiff $313,995 for its building and contents.

From the Court's review of the record, any delay in this action arises from Parkway's lack of cooperation and intransigence in its position on the evaluation of its loss as well as Parkway's insistence that Harleysville pay replacement costs without repairs actually being made. Parkway's position is contrary to the plain language of the policy. In sum, the proof reflects that the Defendant's actions are supported by the insurance policy's provision on payment of a replacement cost claim. The Court finds that Plaintiff's failure to cooperate in providing necessary information on its claim as well as Plaintiff's interference with the Defendant's repair effects are the causes of any injuries to the Plaintiff. Thus, Plaintiff's equitable estoppel claim lacks merit.

22

As to the breach of contract claim, under Tennessee law, an actual repair before payment clause in an insurance contract, such as in the parties' insurance contract, has been held to be enforceable. See Manley v. The Automobile Ins. Co. of Hartford Connecticut, 169 S.W.3d 207, 215 (Tenn. Ct. App. 2005). The Court does not find any facts to support any waiver by Harleysville of this contractual right that was discussed in the Court's earlier ruling. (Docket Entry No. 134, Memorandum at 4).

As to the issue of prejudgment interest, Parkway's policy does not provide for an award of interest on the amount of any loss. Under Tennessee law, prejudgment interest does not accrue until the amount of the loss is fixed by agreement or arbitration. See Third National Bank v. Am Eq. Co. of NY, 178 S.W.2d 915 (Tenn. Ct. App. 1943). Here, the amount of the loss was determined on September 18, 2003, with appraisers' award. Harleysville immediately offered to pay that amount to Parkway, but Parkway rejected that payment. In addition, Harleysville advanced more than half of the undisputed amount to the Parkway after the loss in 1998.

In Myint v. Allstate Insurance Company, 970 S.W.2d 920, 927 (Tenn. 1998), the Tennessee Supreme Court clearly stated the bases for an award of prejudgment interest:

> The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds.

Id. at 927 (emphasis added).

Here, Harleysville's obligation to Parkway was not certain until the appraisal award. Parkway argues that the Defendant has had the use of these proceeds during this litigation,

23

but Harlesyville advanced a substantial amount that Harleysville believed to be the "liquidated" value of Plaintiff's loss in 1998, and tendered the amount of the appraisal award that Parkway refused to accept or rejected such offer. The equities of this action do not weigh in favor of an award of prejudgment interest.

Thus, the Court concludes that Harleysville's motion for partial summary judgment should be granted so as to dismiss with prejudice Plaintiff's claims of equitable estoppel, breach of contract and prejudgment interest.

An appropriate Order is filed herewith.

**ENTERED** this the ___23rd___ day of June, 2006.

WILLIAM J. HAYNES, JR.
Untied States District Judge